# United States District Court

NORTHERN DISTRICT OF INDIANA

FILED
SEP 0 2 2004
PAUL R. CHERRY
UNITED STATES MAGISTRATE
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA
v.
ALAVAR
CHARLES TANNER, AKA "DUKE"

CRIMINAL COMPLAINT

CASE NO.    2:04 MJ 129

I, Christopher E. Allen, with the Federal Bureau of Investigation, and undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about September 1, 2004, in Lake County, in the Northern District of Indiana defendant(s) did;

knowingly and intentionally attempting to possess with intent to distribute cocaine, a controlled substance; and knowingly and intentionally using and causing to be used a communication facility, specifically a telephone, to facilitate the commission of a drug felony;

in violation of Title 21 United States Code Section(s) 846, 841(a)(1), and 843(b) and Title 18 United States Code Section 2.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.    ( X ) Yes    ( ) No

Signature of Complainant
Christopher E. Allen

Sworn to before me, and subscribed in my presence

SEPTEMBER 2, 2004                            at the    NORTHERN DISTRICT OF INDIANA
Date                                                    City and State

PAUL R. CHERRY                                          S/Paul R. Cherry
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                      Signature of Judicial Officer
AUSA THOMAS L. KIRSCH II

# AFFIDAVIT

Christopher E. Allen, Special Agent, Federal Bureau of Investigation, being duly sworn under oath states as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since December 2001. I am currently assigned to the Gang Response Investigative Team, a local, State and Federal task force focusing on drug crimes and violent crimes in Northwest Indiana. In connection with my official duties, I investigate criminal violations of Federal narcotics law, including but not limited to Title 21, United States Code, Sections, 841, 846 and 848.

2. I am familiar with the ways in which narcotic traffickers conduct their business, including but not limited to, their methods of importing and distributing narcotics, their use of telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

3. I am familiar with and have participated in all of the normal methods of investigation, including but not limited to, visual surveillance, the general questioning of witnesses, the use of informants and undercover operations. I also have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and laundering and concealing of proceeds from drug trafficking.

4. This affidavit is submitted for the limited purpose of establishing probable cause in support of the attached application and there contains only a summary of the relevant facts. I have not included each and every fact known to me concerning the individuals and offences

described herein. The information in this affidavit is based on my firsthand knowledge and information provided by other law enforcement officers and witnesses

5. I have participated in the investigation of the offenses described below and have written and read reports concerning the progress thereof. As a result, I am fully familiar with all aspects of the investigation.

6. On the basis of the information contained within this affidavit, I submit that the facts contained herein are sufficient to establish probable cause to believe that on or about September 1, 2004, in the Northern District of Indiana, Charles Tanner, aka "Duke", did knowingly and intentionally attempt to posses with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and used a communication facility, a telephone, to facilitate the commission of a narcotics felony in violation of Title 21, United States Code, Section 843(b).

## SUMMARY OF PROBABLE CAUSE

7. On August 31, 2004, GRIT Investigators arrested Erbey Solis Jr. in the parking lot of the Ameri Host Hotel in Hammond, Indiana. At the time of the arrest, Solis was sitting in the front driver's seat of a White, Cheverlot Sport Utility Vehicle, bearing Indiana License Plate Number F/S 5179. A second individual was sitting in the front passenger sear of Solis's vehicle. Solis and the second individual were removed the SUV and arrested. Immediately after Solis was removed from the front drivers seat of the SUV, GRIT Investigators observed a Glock semi-automatic handgun in plain view on the front seat. The Glock contained a magazine loaded with bullets. Also in plain view, immediately to the right of where Solis had been sitting in the SUV, was a grey square block in a vacuum sealed plastic bag with a noticeable hole in the top of the

2

block. Written on the exterior of the plastic packaging, in black ink, was "1303g". This package was taken into custody by GRIT Investigators and transported to the GRIT Office. The package contained a white hard powder substance. A small portion of the substance inside the package was field tested for the presence of cocaine. The small portion of the substance tested positive for the presence of cocaine. The total weight of the package was 1304 grams. GRIT Investigators also recovered four cellular telephones from Solis at the time of his arrest.

8. Once at the GRIT Office, Solis was advised of his Miranda Rights. Solis signed a Waiver of Rights form and agreed to speak with GRIT Investigators without an attorney present. Solis stated that he had supplied multiple kilogram quantities of powder cocaine to Charles Tanner, aka "Duke", on five occasions. Solis said that during his first transaction with Tanner, Tanner provided Solis with $95,000.00 United States Currency (USC) and Tanner was provided with five kilograms of powder cocaine by Solis, at a cost of $19,000.00 USC per kilogram. Solis said that "the very next day" Tanner bought an additional 10 kilograms of powder cocaine and paid Solis a total of $190,000.00 USC. Solis said that the third purchase involving Tanner took place "the very next day", following the second purchase, and again involved a 10 kilogram transaction of powder cocaine for $190,00.00 USC . Solis said that the fourth transaction took place the next day after the third transaction and involved 11 kilograms of powder cocaine. Tanner paid Solis $209,00.00 USC for the cocaine. Solis said that the fifth sale of powder cocaine to Tanner did not take place for several weeks, because Solis could not meet the price that Tanner was trying to pay for the cocaine. Solis said that the fifth transaction with Tanner occurred "last week". Solis said that he "fronted" Tanner 11 kilograms of powder cocaine, at a

3

cost of $19,000.00 USC per kilogram. Soils said that he met Tanner last Thursday at a Marathon Gas Station in Hammond, Indiana, where Tanner gave Solis $209,000.00 USC.

9. On August 31, 2004, beginning at approximately 9:41 p.m., Solis placed a consensually monitored and recorded "Nextel" direct connect call to Tanner. During this conversation, Tanner told Solis that his other source of powder cocaine had not contacted him back as expected. During the conversation, Solis asked Tanner how many kilograms of powder cocaine Tanner could purchase for $18,000.00 USC. Tanner told Solis that he could probably not purchase any cocaine, but, if Solis was willing to "front" the cocaine to Tanner, that Tanner could return with the money for payment within a day. Tanner told Solis that he could probably return with the money in only four hours.

10. On September 1, 2004, Solis and Tanner engaged in a series of at least eleven consensually monitored and recorded "Nextel" direct connect calls. During these telephone calls, Solis ultimately agreed to "front" 15 kilograms of powder cocaine to Tanner. Tanner agreed to pay Solis between $18,000 and $18,500.00 USC per kilo and he agreed to have the money to Solis by Friday evening. Tanner told Solis that he needed to get 15 kilos from Solis, because, if he was only able to get "five or six of them", it "ain't even worth it." Tanner ultimately instructed Solis to meet him in the parking lot of the Walgreen's, located on Grant Street in Gary, Indiana, where Solis was to "front" the 15 kilograms of cocaine to Tanner.

11. After the final consensually monitored and recorded telephone call between Tanner and Solis, GRIT Investigators searched Solis and Solis's vehicle for contraband with negative results. Solis was fitted with a KEL Transmitter, which is a device that allows investigators to monitor Solis's conversations. Solis and Solis's vehicle were fitted with audio

4

and video recording devices. Solis was then provided with two containers (One Fabric Cooler and One Duffle Bag), each containing simulated kilograms of powder cocaine, totaling 15 simulated kilograms of cocaine between the two containers. These simulated kilograms of powder cocaine were similar in appearance to the kilogram of powder cocaine that was recovered from Solis upon his arrest on August 31, 2004.

12. Solis then drove his vehicle, under the constant visual surveillance of GRIT Investigators, to the parking lot of the Walgreen's Store on Grant Street in Gary, Indiana. Additional GRIT Investigators were already maintaining surveillance of the Walgreen's parking lot. Solis arrived at the parking lot and observed Tanner's black Corvette parked in the parking lot of the Walgreens. Solis observed Tanner, who was wearing a white and red basketball jersey, standing next to a Pontiac Grand Am. Solis pulled his vehicle into the immediate vicinity of Tanner, who approached Solis's vehicle and opened the passenger side rear door of Solis's vehicle. Solis told Tanner "They're on my side behind my seat," referring to the bags containing the simulated cocaine. Solis then backed his vehicle into a parking space directly north of the Grand Am. Tanner then opened the drivers side rear door of Solis's vehicle, removed the two bags containing the simulated cocaine, and placed them into the trunk of the Grand Am. GRIT Investigators taking part in the physical surveillance observed Tanner move the bags of simulated cocaine from Solis's vehicle to the trunk of the Grand Am. A review of the surveillance video conducted later in the evening also confirmed that Tanner moved the bags of suspected cocaine from the driver side rear of Solis's vehicle to the trunk of the Grand Am.

13. After observing Tanner place the simulated cocaine into the trunk of the Grand Am, GRIT Investigators approached Tanner, who was now in the driver's sear of the Grand Am,

and placed him under arrest. Tanner's girlfriend, who was in the drivers seat of Tanner's corvette, was also arrested. At the time of her arrest, Tanner's girlfriend stated that she was the owner of the Grand Am and provided GRIT Investigators with verbal consent to search the vehicle. Tanner and his girlfriend were both transported to the GRIT Office. Tanner's Corvette and the Grand Am that his girlfriend identified as belonging to her were both transported to the GRIT Office by GRIT Investigators.

14. Upon arrival at the GRIT Office, Tanner's girlfriend stated that she had driven the Grand Am to the Walgreen's and that Tanner had driven the Corvette to Walgreen's. Tanner's girlfriend said that the reason that she was in the Corvette at the time of her arrest was because Tanner had offered to let her drive the vehicle. Tanner's girlfriend stated that she was the owner and primary operator of the Grand Am. A check with the Indiana Bureau of Motor vehicles confirmed that the vehicle was registered to her. Tanner's girlfriend again gave GRIT Investigators consent to search her vehicle, and she signed an FBI Consent to Search form stating so.

15. Acting on the verbal and written consent to search provided by Tanner's girlfriend, GRIT Investigators searched the Grand Am. In the trunk of the vehicle, GRIT Investigators located the two bags, containing a total of 15 simulated kilograms of cocaine, which

were identified as the same 15 simulated kilograms of cocaine that had been provided to Solis earlier in the afternoon by GRIT Investigators.

FURTHER AFFIANT SAYETH NOT.

_____
Christopher E. Allen
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 2nd day of September 2004.

S/Paul R. Cherry
_____
Honorable Paul Cherry
United States Magistrate Judge