1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF INDIANA
2              HAMMOND DIVISION

3

4

5  United States of America

6     vs.                              2:04-CR-80

7  Charles Tanner,

8       Defendant.

9

10

11

12              VOLUME III OF III

13            TRANSCRIPT OF SENTENCING

14        BEFORE THE HONORABLE RUDY LOZANO

15          UNITED STATES DISTRICT JUDGE

16              HAMMOND, INDIANA

17               MAY 26, 2009

18

19

20  Court Reporter:          Richard D. Ehrlich, RMR, CRR
                             Official Court Reporter
21                           United States District Court
                             5400 Federal Plaza, Suite 4082
22                           Hammond, IN 46320
                             (219) 852-6557
23

24  Proceedings reported by stenotype.  Transcript produced by

25  Computer-aided transcription.

1                    A P P E A R A N C E S:

2

3    FOR THE GOVERNMENT:

4             David J. Nozick
              Jacqueline L. Jacobs
5             U.S. Attorney's Office
              5400 Federal Plaza, Suite 1500
6             Hammond, IN 46320
              219-937-5500
7

8

     FOR THE DEFENDANT:
9
              Andrea E. Gambino, Esquire
10            Law Offices of Andrea E. Gambino
              53 W. Jackson Boulevard, Suite 926
11            Chicago, IL  60604
              (312) 322-0014
12

13            Charles Tanner, Defendant, present in person.

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Counsel, I have received from you some

2     memorandums regarding the objections.  Did each of you receive

3     copies of each other's memorandums?

4          MS. GAMBINO:  Yes, Your Honor.

5          MR. NOZICK:  Yes, Your Honor.

6          THE COURT:  I believe, Counsel, the way we left this

7     case is that we were going to proceed today with the Court

8     giving rulings on all of the objections without further arguing

9     of any kind.  I think we've argued it orally.  We've argued it

10    in writing.  We've argued it in writing over and over again.  I

11    was under the belief that I was not going to give you any

12    additional time to argue what sentence I would give.

13        Ms. Gambino, today you convinced me that you wanted some

14    time, and I think we did talk about that at the last

15    sentencing, and I believe I said 20 minutes.  But, again,

16    Ms. Gambino, you convinced me to make that a half an hour, and

17    I have given you and the Government a half an hour.

18         MS. GAMBINO:  Thank you, Judge.

19         THE COURT:  Is that true and is that agreeable?

20         MS. GAMBINO:  That's true.

21         MR. NOZICK:  Yes, Your Honor.

22         THE COURT:  Okay.  I will also say that I expect,

23    because of the seriousness of this case, for everybody in the

24    audience to act as ladies and gentlemen.  If I start getting

25    too many improper comments or sighs or whatever, I will remove

1    you from the courtroom.  I hope that's not necessary.  In

2    fairness to Mr. Tanner, I would like to have him to be able to

3    be heard and not have interruptions.

4        Ms. Gambino, the one thing that I don't remember agreeing

5    or not agreeing with you is Mr. Tanner's right to be heard.

6    Does he wish to be heard today?

7                MS. GAMBINO:  Yes, he does, Your Honor.

8                THE COURT:  Okay.  And how long is that going to

9    take?

10                MS. GAMBINO:  Your Honor, it probably won't take much

11    more than 15 or 20 minutes.

12                THE COURT:  15, 20 minutes?

13                MS. GAMBINO:  Right.

14                THE COURT:  Ms. Gambino, in fairness to Mr. Tanner,

15    you're going to have to speak up.  One, I'm getting older, and

16    it's harder for me to hear, but I want the court reporter to

17    take the testimony down, and it's important for you to be

18    heard.  Okay?

19                MS. GAMBINO:  I will, Your Honor.

20                THE COURT:  Okay.  Mr. Nozick, I'm not going to say

21    anything to you because I always am able to hear you.

22                MR. NOZICK:  Yes, Your Honor.

23                THE COURT:  Is Ms. Jacobs going to be speaking today?

24                MS. JACOBS:  No, Your Honor.

25                THE COURT:  This is the case of the *United States of*

1   *America vs. Charles Tanner.*   Hammond Criminal Number

2    2:04-CR-80.

3       The defendant is present in person and with his attorney,

4   Andrea Gambino.

5       The Government is represented by its Assistant United

6   States Attorneys, David Nozick and Jackie Jacobs.

7       The Court's probation office is represented by its

8   probation officer, Ms. Paula Pramuk.

9       Mr. Tanner, on the 6th day of November of the year 2006,

10  the Court accepted your plea of guilty to Counts II and III of

11  the superceding indictment and reserved its decision as to

12  whether to accept -- Counsel, there's been so many different

13  continuances.  Was there a plea agreement in this case?

14          MR. NOZICK:  Your Honor, this was a trial.

15          MS. GAMBINO:  This was a jury verdict, Your Honor.

16          MR. NOZICK:  This was a jury verdict.

17          THE COURT:  Okay.  Let me back up then.  Let me get

18  the -- on the 6th day of November of the year 2006, a jury

19  returned a verdict finding you guilty of Counts II and III.  I

20  do not see that this is a superceding indictment; is that

21  correct?

22          MR. NOZICK:  I'm trying to recall if there was an

23  initial indictment or superceding.  Let me check.  I believe

24  there was a second indictment.  So I believe it would have been

25  a superceding indictment, Judge.  I believe it's a superceding

1     indictment, Judge.

2          THE COURT:  Because that's what I had in my dialogue,

3     but I don't see that in the presentence report.

4        Ms. Gambino, do you agree this was a superceding

5     indictment?

6          MS. GAMBINO:  Yes, Your Honor, it was a superceding

7     indictment.

8          THE COURT:  Okay.  The jury returned a verdict

9     finding you guilty of Counts II and III of the superceding

10    indictment in this case, and this Court adjudged you guilty of

11    those offenses.

12       On the 14th day of August of the year 2007, I received a

13    written presentence report together with an addendum setting

14    forth any objections counsel have made that have to be resolved

15    together with the probation officer's comments therein from the

16    probation office, and I have studied that report and the

17    addendum.

18       Again, on the 27th day of March of the year 2009, I

19    received a second version of the presentence report, and that

20    is the one that I am going to be using today.  At any rate, on

21    the 27th day of March of the year 2009, I received a written

22    presentence report together with an addendum setting forth any

23    objections counsel have made that have to be resolved together

24    with the probation officer's comments therein from the

25    probation office, and I have studied that report and the

1  addendum.

2      Counsel, do both of you agree that the ones that we're

3  going to be going by is the one dated 27 March?

4          MS. GAMBINO:  That's correct, Judge.  That's the most

5  recent.

6          MR. NOZICK:  That's correct, Judge.

7          THE COURT:  Counsel, I have also received numerous

8  letters from relatives, friends, coworkers.  We had testimony

9  here in court from relatives, friends, and coworkers.  The

10  testimony part is no problem.  That's preserved because it's

11  part of the record.

12      In the event that I have not said it before, any objection

13  to making all these letters that we have part of the record in

14  this case?

15          MS. GAMBINO:  No, Your Honor.  They should all be

16  made part of the record.

17          THE COURT:  Pardon?

18          MS. GAMBINO:  They should all be made part of the

19  record, Your Honor.

20          THE COURT:  Bring that microphone closer to you.

21  There you go.  Any objection to that?

22          MR. NOZICK:  No objection.

23          THE COURT:  It is so ordered.

24      Ms. Gambino, did both you and your client receive and

25  review a copy of the presentence investigation report and the

1 addendum setting forth any objection counsel have made that

2 have to be resolved at this hearing before a sentencing

3 hearing?

4          MS. GAMBINO:  Yes.

5          THE COURT:  Mr. Tanner, did you receive and review a

6 copy of the presentence investigation report with the addendum

7 and go over its contents with your attorney prior to today?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And, Mr. Nozick and Ms. Jacobs, did you

10 receive and review a copy of the presentence investigation

11 report with the addendum prepared by the probation office?

12          MR. NOZICK:  Yes, Your Honor.

13          THE COURT:  Ms. Gambino and Mr. Nozick, do either of

14 you have any requests for any additions, changes, or

15 modifications?

16          MS. GAMBINO:  Not other than the ones we've submitted

17 in writing, Your Honor.

18          THE COURT:  And I've ruled on some of them.  I

19 disallowed and I gave you a ruling on it and a reason for it;

20 is that correct?

21          MS. GAMBINO:  I believe so, yes.

22          MR. NOZICK:  Nothing to add, Judge.

23          THE COURT:  The presentence investigation report and

24 the addendum are now placed in the record under seal.  It is

25 directed that if an appeal is taken, counsel on appeal shall be

1    permitted access to the sealed report.  It is further directed

2    that counsel on appeal are not permitted access to the

3    recommendation section of that report.

4         Ms. Gambino, I think some of the objections were not

5    timely, and I think I did give you an order in writing

6    regarding that matter, and I want to say that one of those was

7    dated March 9th of the year 2008.  I have it here.

8         Counsel, from a review of the presentence investigation

9    report, I see that there are three objections that we are

10   dealing with.  One, the drug quantity assessed against

11   Mr. Tanner in the presentence investigation report that is over

12   150 kilograms of cocaine; two, the gun enhancement in the

13   presentence investigation report, and; three, the role

14   enhancement in the presentence investigation report, i.e., was

15   he a leader of an organization of five or more participants; is

16   that correct?

17             MS. GAMBINO:  Those are the primary objections, yes,

18   Your Honor.

19             MR. NOZICK:  Yes, Judge.  I think they're the only

20   objections.

21             THE COURT:  These are the only ones that I allowed;

22   is that correct?

23             MS. GAMBINO:  That's correct.

24             THE COURT:  Okay.  The Court adopts the factual

25   statements contained in the presentence investigation report as

1    to which there are no objections.  As to the controverted

2    factual statements, the Court will rule on those in a minute.

3    I've already held hearings with regards to all of those.

4         The defendant objects to the drug quantity assessed

5    against him in the presentence investigation report as not

6    being supported by the evidence at trial.  After having heard

7    the evidence in the case, after having reviewed the objections

8    and the comments of counsel, having considered the law, and

9    after having considered the credibility of the witnesses, this

10   Court finds the following facts by a preponderance of the

11   evidence:  First, that Arthia Lamont Tanner, Charles Tanner,

12   LaShawn Tanner, Lance Foster, and Warren Moore, were all

13   working together as part of The Renegades, a drug trafficking

14   organization, that they bought and distributed drugs including

15   cocaine, cocaine based, and marijuana in furtherance of The

16   Renegades jointly undertaken plan to distribute drugs, and that

17   the amount of drugs they bought and sold was reasonably

18   foreseeable to Charles Tanner.

19        Second, that Charles Tanner, Arthia Lamont Tanner, LaShawn

20   Tanner, and Warren Moore were all dealing cocaine and crack

21   cocaine at least as of 1999 and continuing through September of

22   the year 2004; that this activity was reasonably foreseeable to

23   Charles Tanner and in furtherance of The Renegades jointly

24   undertaken plan.  In this regard, this Court credits Solise's

25   testimony that he began selling marijuana to Charles Tanner,

1    and Charles Tanner began distributing it as early as 1997; that

2    he sold cocaine and marijuana to Moore beginning in 1997; that

3    he sold cocaine to all three Tanner brothers by late 1990.

4    This Court also credits Warren Moore's testimony that he was

5    buying $1/8^{th}$ half and whole kilograms quantity of cocaine from

6    Solis in 1997; and that he, Charles Tanner, Lance Foster,

7    Lamont Tanner, and LaShawn Tanner, were all dealing cocaine and

8    crack cocaine by 1999.

9         Third, that Arthia Lamont Tanner, LaShawn Tanner, and

10   Warren Moore bought over 100 kilograms of cocaine in

11   furtherance of The Renegades jointly undertaken plan to

12   distribute drugs, and that this activity was reasonably

13   foreseeable to Charles Tanner.  In this regard, the Court

14   credits Solis's testimony that he sold over 100 kilograms of

15   cocaine to Lamont and LaShawn Tanner and sometimes in the

16   presence of Charles Tanner, and that he sold anywhere from four

17   one-half ounces to multiple kilograms cocaine to Warren Moore.

18   This Court also credits Warren Moore's testimony that he bought

19   cocaine from Solis more than 20 times, and that he bought

20   cocaine from Lamont Tanner in the $1/8^{th}$ of a kilogram or ounce

21   quantities more than 100 times.  This Court also credits Warren

22   Moore's testimony that he personally saw drugs and money change

23   hands between the Tanner brothers.

24        Fourth, that Charles Tanner alone sold more than

25   150 kilograms of cocaine.  In this regard, the Court credits

1  Solis's testimony that Charles Tanner told him that he sold

2  50 kilograms of cocaine a week from the year 2000 through 2004,

3  and Warren Moore's testimony that Charles Tanner sold him

4  cocaine on about six occasions totaling over at least

5  two-and-a-half kilograms of cocaine.

6       Fifth, that Charles Tanner bought over 150 kilograms of

7  cocaine.  In this regard, the Court credits Solis's testimony

8  that on five occasions he sold multiple kilograms of cocaine to

9  Charles Tanner; that Charles Tanner bought 15 kilograms of sham

10  cocaine from him; that Charles Tanner bought 100 kilograms of

11  cocaine from a Hispanic supplier from Berwin, Illinois; and

12  that Charles Tanner was buying about 50 kilograms of cocaine a

13  week from a supplier in Berwin, Illinois.  Further, the Court

14  credits Agent Allen's testimony that Charles Tanner admitted to

15  purchasing 10 to 15 kilograms of cocaine at a time from Renee,

16  or "Puppy"; that Charles Tanner admitted to receiving multiple

17  kilograms of cocaine at a time from Rocky Martinez.  Although

18  not part of the presentence investigation report, the Court

19  knows that a significant amount of cocaine was also sold by The

20  Renegades.

21       After having heard the evidence of the case, having

22  reviewed the objections and comments of counsel, and having

23  considered the law, and after having considered the credibility

24  of witnesses, this Court finds by a preponderance of the

25  evidence that Charles Tanner possessed guns during the course

1  of the conspiracy.  In this regard, the Court credits Warren

2  Moore's and Solis's testimony that Charles Tanner possessed

3  guns during the course of the conspiracy; that Charles Tanner

4  had a gun at his mother's house, and that The Renegades bought

5  and sold drugs there, and that Charles Tanner had a gun at his

6  house in Chicago where he sold drugs and kept drugs and kept

7  the drug money.  This Court also notes that there is no

8  evidence indicating that it is clearly improbable that Tanner's

9  possession of these guns was connected to his drug dealing

10 activity.

11      After having heard all of the evidence of the case, having

12 reviewed the objections and comments of counsel, having

13 considered the law, and after having considered the credibility

14 of the witnesses, this Court finds the following facts by a

15 preponderance of the evidence:  First, that Charles Tanner was

16 an organizer or leader of The Renegades beginning in about 2000

17 to 2001.  In this regard, the Court credits Warren Moore's

18 testimony that beginning in about 2000 or 2001, Charles Tanner

19 was the leader of The Renegades.  Charles Tanner was the leader

20 of The Renegades -- I'm sorry.  That the same person was not

21 always in charge, but the power shifted to the Tanner brother

22 who had the most money, and that early on LaShawn Tanner was

23 the leader, but Lamont Tanner took over, and then the power

24 shifted to Charles Tanner.

25      And, second, that The Renegades had five or more members,

1   members of The Renegades, including Warren Moore, Don Moore,

2   Charles Tanner, Lance Foster, Arthia Tanner, Lashawn Tanner,

3   Larry Scott, Leon Walker, Brandon Roy, Letrial Thomas, and

4   Clarence Curick.  With regard to each of these objections, the

5   Court finds in favor of the probation department and the

6   Government.

7        Counsel, have I ruled on the objections that we have

8   before us?

9             MS. GAMBINO:  You have ruled on the objections.

10            MR. NOZICK:  Yes, Your Honor.

11            THE COURT:  The Court thus determines that the

12   applicable guidelines are Total Offense Level 44, Criminal

13   History Category 1, calling for life imprisonment; 5 years

14   supervised release, $25,000 to 8 million-dollar fine plus cost

15   of imprisonment and/or supervision, and a $200 special

16   assessment.

17        Ms. Gambino, as attorney for the defendant, do you have

18   anything to say on the defendant's behalf before sentencing?

19            MS. GAMBINO:  Yes, I do.

20            THE COURT:  Okay.  I'm going to ask you if you'll

21   come to the podium and set yourself up there so that hopefully

22   you can speak closer to the microphone so I can hear you.

23            MS. GAMBINO:  First of all, Your Honor, with respect

24   to the rulings, we understand that you have ruled.  We do, of

25   course, object to each and every one of those rulings and

1   disagree strongly with the factual findings of the Court.

2       The question then becomes what is the reasonable sentence

3   for Mr. Tanner, and it is our position that the reasonable

4   sentence is not represented by the guidelines.  In this

5   particular case, we are talking about the most serious

6   sentence --

7           THE COURT:  Ms. Gambino, I know I only gave you a

8   half an hour, but I did give you an opportunity to brief it.

9   You're going to have to slow down, but you're not going to have

10  much of a record if you start picking up speed.

11          MS. GAMBINO:  Okay.  I will go through this very

12  slowly.

13          THE COURT:  I mean that in a courteous way.  I'm not

14  trying to speak down to you.

15          MS. GAMBINO:  A life sentence in this case, a life

16  sentence is the most serious sentence that's available apart

17  from the death penalty, which is never a question in this case

18  and which is very rarely imposed, and a life sentence is what

19  we, as a society, reserve for those people who commit the most

20  heinous crimes.  And what we are talking about here is not a

21  case which, like many come before this Court, involve violence,

22  involves murder, involves death, involves anything of that

23  nature.  We are talking also about a person who has never been

24  in trouble with the law before.  Charles Tanner's record was

25  clear up until the point of this offense, and the reason it was

1    clear is that Mr. Charles Tanner is not a drug dealer.  He is a

2    boxer.  Mr. Charles Tanner began boxing as a child, as you

3    heard from many witnesses, at the age of 10, actually before

4    that, and had a stellar amateur record.  When other people were

5    out doing whatever they were doing in 1999 through 2004,

6    Mr. Tanner was a professional boxer.  And we heard from many

7    witnesses about the rigorous training that a professional boxer

8    must go through in order to maintain his edge and be able to

9    fight in the way that Mr. Tanner fought.

10        Now, Your Honor asked about the authority of the Court to

11   give a sentence that's not a guideline sentence, and I think we

12   should start there.  The United States Supreme Court in *Nelson*

13   *vs. The United States,* a case started in January, has sent down

14   on three different occasions a case where the stakes were

15   similar, 360 to life for this young man because the Court kept

16   continually finding that the guideline sentence was

17   presumptively reasonable.  That is not the case.  Guidelines

18   are advisory and not mandatory or presumed to be reasonable.

19        In addition, the Seventh Circuit Court of Appeals has, on

20   many occasions, upheld the Court when it drastically departed

21   from a guideline sentence.  For instance, in the case of *United*

22   *States vs. Angottia,* the guideline range was 188 to 235 months.

23   The Court imposed an 84-month sentence, and that was upheld by

24   the Seventh Circuit Court of Appeals.

25        In the case of Paladino, the Court imposed a 180-month

1  sentence where the guidelines were --

2          THE COURT:  Ms. Gambino, just so that I'm clear,

3  these are not my cases.  These are a Court?

4          MS. GAMBINO:  These are the Seventh Circuit Court of

5  Appeals to whom you are responsible, Your Honor, who has said

6  that you --

7          THE COURT:  I'm not asking you that, Ms. Gambino.

8  All I'm saying is it was not my case that went through?

9          MS. GAMBINO:  No.  No.  This was not your case.

10         THE COURT:  At some point you're talking about my

11 cases, and then you're jumping, you know, you're talking

12 about --

13         MS. GAMBINO:  I am talking about the authority that

14 you have, Your Honor, based on the Supreme Court and the

15 Seventh Circuit Court of Appeals and the responsibility to not

16 only look at what the guidelines are but to look at factors

17 outside the guidelines and to determine what the appropriate

18 sentence is.

19     In this case, so I can be very clear, the mandatory

20 minimum is ten years, and that is what we are asking the Court

21 to impose.  We think that a life sentence is completely

22 unreasonable, and Congress requires that the sentence

23 imposed --

24         THE COURT:  I'm sorry.  Go ahead.

25         MS. GAMBINO:  I'm sorry, Your Honor.  You were

1    looking at your watch.

2          THE COURT:  No, no.  I was looking at something else

3    right now, Ms. Gambino.

4          MS. GAMBINO:  Charles Tanner gained the faith of a

5    series of investors, lawyers, doctors, and other trainers who

6    were so willing to put their faith in him that they paid for

7    his education at a Catholic high school so that he could go to

8    school, get an education, and continue his boxing career.  And

9    Your Honor saw the kind of grades and the comments that

10   Mr. Tanner got when he was in high school during a part of the

11   time when this conspiracy was alleged, and Your Honor heard

12   from lawyers and professionals who were willing to support and

13   did support Mr. Tanner in his professional boxing career.  But

14   beyond his talent as a boxer, you have heard from a courtroom

15   full of people, and we could keep this Court going for days,

16   for hours, for even a year I would imagine to say of people

17   that are describing the good things, the positive things about

18   Mr. Charles Tanner.

19        When you're trying to decide what is appropriate in this

20   case, you have to look at the personal history and

21   characteristics of Mr. Tanner; a person who is a very young man

22   at this point still at the age of 28.  If Your Honor were to

23   impose a sentence of the mandatory minimum of ten years, Mr.

24   Tanner would still be able to be released to be a father to his

25   son, to retain his career, and to go on and do other positive

1  things with respect to his life.  He is not the kind of person,

2  the incorrigible reoffender who has to be sent to jail for the

3  rest of his life to keep the rest of us safe or to teach him a

4  lesson.  What happened in this case simply doesn't rise to that

5  level.  We are talking about evidence at trial that involved 15

6  sham kilograms of cocaine.

7      Now, we know that Mr. Tanner wasn't the leader and the

8  organizer.  If he were he wouldn't have been there to pick up

9  those 15 sham kilograms from Mr. Solis who had tried for months

10 to get him to do something, and not only did he supposedly buy

11 sham kilograms of cocaine but had no money to pay for them.

12     If Mr. Tanner was what is alleged by Warren Moore and

13 Erbey Solis, certainly he wouldn't have been present, and he

14 would've had more than enough money to pay for what he had.

15     No money, no weapons, and no drugs were found on his

16 person, in his house, in his car.  Your Honor has had to rely

17 on the hearsay evidence of Mr. Erbey Solis and Mr. Warren Moore

18 in order to find that he's responsible for these things;

19 rather, you heard from witnesses here who testified about him,

20 Mr. Tanner, being the first male of his family to finish high

21 school and to start college.  You heard about his discipline.

22 You heard about Earl Bell talk about what he had to do to

23 prepare to be a boxer.  You heard about his generosity, and the

24 fact that he brought himself and his followers, Your Honor, to

25 the church, and you heard from his pastor and the other

1    individuals who were involved in the church.  You heard about

2    his willingness to help others to lead his family and other

3    people on a positive path and not in a negative path; that he

4    was willing to give the shirt off his back to anyone who needed

5    it; that he provided training and equipment and support to

6    other young people in the community at the Gary PAL police gym

7    where he trained himself.  He helped other people to get

8    involved in boxing.  He supported Don Moore and his effort to

9    get involved in boxing.  You have heard nothing but positive

10   things about the character and the history and the personal

11   characteristics of Charles Tanner.  There is no evidence in

12   this case or anywhere else where he has been involved in

13   violence, where he has been involved in --

14           THE COURT:  I'm sorry.  I didn't hear that.  I wasn't

15   sure what the last word was.  I understand what you're saying,

16   "Violence."

17           MS. GAMBINO:  Violence.  No violence.  There is

18   nobody that came into this courtroom and said, "We found a gun

19   in Mr. Tanner's possession."

20       When you refer to the guns that were found at Mr. Tanner's

21   mother's house in 1999, the testimony at trial from the police

22   officers was that this was on New Year's Eve, that they

23   couldn't identify who these guns belonged to, and they didn't

24   even identify whether or not Mr. Tanner was present.  Mr.

25   Tanner is simply not the kind of person who needs to be put

1    away for the rest of his life.

2          Your Honor also has to consider the case of just

3    punishment; just punishment with respect to the 3553(a)

4    factors.  Your Honor, one of the things that you have to

5    consider is what is just punishment in this case.  And just

6    punishment does not mean the highest punishment possible.  Just

7    punishment means considering the individual and the offense.

8    And even our now attorney general, Mr. Holder, has said justice

9    is not about winning, it's about doing the right thing.  And

10   doing the right thing in this case is not to send this man off

11   to prison for life.  And we know that, too, Your Honor, because

12   the last time we were here, the Government came in and said

13   they were willing to recommend a sentence of 25 years for

14   Mr. Tanner.  Even a sentence of 25 years, Your Honor, is beyond

15   what is necessary in this particular case.  When a person

16   commits a first offense, you don't throw the book at them and

17   take away their life.  When a child commits a first error, you

18   don't send him to jail.  When people commit first offenses, the

19   law and society and reason say that the response should be

20   measured and should not be severe.

21         With respect to deterrence.  You do not need to send

22   Mr. Tanner to prison for another day to deter him from ever

23   becoming involved with anyone or anything that is even remotely

24   illegal.  He has never, before this case, spent a day in jail.

25   He doesn't even have an arrest record.  The only thing on

1    Mr. Tanner's record was a disorderly arrest that was disposed

2    of as a juvenile.  You know, he is not a person who is a repeat

3    offender because he is not a person who is out there on the

4    regular engaging in illegal activity.

5         You have to consider whether we need to protect the public

6    from this defendant, and the public does not need to be

7    protected from Mr. Tanner.  Mr. Tanner is an honor and a role

8    model and a positive, contributing member of his community.  He

9    has done many, many things to help countless numbers of people,

10   and he's worked his way out of poverty and out of a difficult

11   environment and was on his way out, and he was bringing others

12   with him.  You do not need to send him to jail for another day

13   to protect the public from him; rather, I think the public

14   would benefit from his example saying, "Look.  This is what

15   happened to me.  Don't make the same mistakes.  Don't get

16   involved in this kind of thing in any way, shape, or form, and

17   do the right thing."

18        He will continue on the positive path that he started out

19   on many, many years ago, and you heard that from every witness

20   that testified in front of this Court.

21        You have to consider about unwarranted sentencing

22   disparities.

23             THE COURT:  I'm sorry?

24             MS. GAMBINO:  Unwarranted sentencing disparities.

25        In this particular case, the two individuals who were

1  providing testimony, Mr. Warren Moore, for instance, he will be

2  released from prison next September, and Mr. Warren Moore was

3  caught dead to rights with real cocaine and real weapons, and

4  Mr. Erbey Solis, also another person on whose word you had to

5  rely in order to make your sentencing findings, is another who

6  was caught dead to rights with drugs and with weapons.  That is

7  not the same.  And those were real drugs and real weapons and

8  not some fake drugs that were made up to get somebody in

9  trouble who shouldn't have been gotten in trouble, and

10 Mr. Solis --

11         THE COURT:  The jury didn't find that, did they,

12 Ms. Gambino?

13         MS. GAMBINO:  The jury didn't receive testimony that

14 supports nearly what you have made your findings based on, Your

15 Honor.  The jury heard from Mr. Moore, for example, that he did

16 a half kilo to one kilo transaction of cocaine and marijuana in

17 2003 and 2004.  That's in Volume II, page 531, and pages 580 to

18 583 of the trial transcript.  Solis testified about the 15 sham

19 kilograms at trial, but he only remembered three prior

20 transactions and couldn't remember the amounts at all at trial;

21 Volume IV, 219 to 220.  He only remembered a one kilo deal at

22 trial.  Volume IV, page 1,013.

23    All the other information in the PSI is based on proffer

24 statements that were not testified to under oath but were

25 things made up by those individuals to persuade the Government

1  that they would be good witnesses and to get themselves out

2  from under the problems that they faced because they were

3  caught with real drugs and real guns.

4      So that evidence didn't get before the Court, didn't get

5  before the jury.  The jury convicted Mr. Tanner of the 15 sham

6  kilograms and of being a member of a conspiracy.

7          THE COURT:  For that they got to see a video, didn't

8  they, for him reaching for the cooler of 15, alleged 15 --

9          MS. GAMBINO:  15 sham kilograms.  Any real drug

10 dealer wouldn't have just taken a cooler full of drugs without

11 testing or looking to see if they were real.  Any real drug

12 dealer wouldn't have conducted his business in the open

13 Walgreens parking lot.  Any real drug dealer that was dealing

14 150 kilograms or more of cocaine would've sent some other

15 person to do that deal.

16         THE COURT:  The jury didn't find that, did they?

17         MS. GAMBINO:  The jury found that he was guilty of 15

18 sham kilograms, Your Honor, not over 150.  They didn't hear

19 evidence of over 150 kilograms of cocaine.

20         THE COURT:  My point being is that the jury didn't

21 disregard the reaching for the 15 kilograms of you say sham

22 cocaine?

23         MS. GAMBINO:  That's correct, Your Honor.

24         THE COURT:  He thought it was cocaine, but the police

25 said that it was sham at the point.

1      MS. GAMBINO:  We don't know what he thought because

2   he didn't testify at trial, and he has maintained his innocence

3   of this offense from the very beginning and does to this day.

4   And certainly nothing at trial amounted to the 150 kilograms or

5   more that was put in these proffer statements that were given

6   for the Government's purpose and was not testified to at trial

7   and under oath.

8      And Mr. Moore, as we know, had his own reasons for doing

9   this.  He was worried about his family.  He wrote to a fellow

10  boxer, Damon, and he says, "Let me tell you:  These Feds aren't

11  playing around.  They want me to testify against Duke and the

12  rest of the people on the case to get a better sentence.  We

13  are facing ten years to life, so I got -- they messed up, not

14  me.  They played a phone call to me where they had me telling

15  Nickie," his girlfriend, "to bring me something from the house.

16  And I was like, "Okay.  You all got me."  Because they were

17  going to lock Nickie up and take our children, and I couldn't

18  let that happen.  So I told -- do what they want me to do.  I

19  had to do it for my family.  They mean a lot to me.  I hope you

20  understand.  I'm not a snitch, but I had to do it for my

21  family."

22     I mean, this is a man who had his own reasons for saying

23  the things that he said.  He also said in a letter to the same

24  Damon on April 8th of 2005, "I set Erbey, and Erbey set Duke

25  up, and the reason everybody is mad at me" --

1      THE COURT:  Ms. Gambino, you're picking up speed on

2  me.  Slow down.

3      MS. GAMBINO:  "The reason everybody is mad at me is I

4  set Lee and about 30 more people up.  I had to.  It's what the

5  Feds wanted, to get Nickie's name out of it, and they were

6  going to have my kids taken by DCF.  Duke and them never did

7  anything for Don while he's been locked up, so what makes me

8  think they would do something for me?  They played hardball and

9  got hit.  I think Jody was an informant, too, if I'm not

10  mistaken.  It was very hard for me to do it to them, and I

11  cried a lot of nights about it.  It still hurts, but I had to

12  do it or let my wife to suffer in jail with me and my children

13  get taken."

14      You know, this is a man who was saying whatever he thought

15  he had to say in order to save himself, his wife, and his

16  children.

17      In comparison to Mr. Tanner, who isn't the kind of person

18  who is doing things that he needs to save his wife, his family,

19  and his children.  He has a young son, a young son that he

20  admits is his son, who is doing well in school and misses him

21  very much.

22      Now, Mr. Warren Moore, on the other hand, testified that

23  he has two children, but you heard from Ms. Ezell that he and

24  her daughter, the woman who ended up dead after he came to her

25  house with a gun, had a child that he denies.

1    We're talking about two very different kinds of people.

2  And when you're talking about sentencing disparities, Your

3  Honor, it turns the whole concept of justice on its head to

4  have Mr. Warren Moore be released from prison in September of

5  2010 while Mr. Tanner is standing here facing a life sentence.

6    You also have to consider whether he will get educational,

7  vocational training and whether his medical needs will be met.

8  And Mr. Tanner, as we sit here today, is suffering from

9  problems, dental problems which they are not addressing in the

10  county jail.  He needs a root canal, and they don't want to

11  give it to him.  All they want to do is pull his tooth.  He's

12  been in this county jail for almost five years now.  During

13  that time he has not been able to hold his son or even see any

14  of his family members face to face, only minimally between

15  glass or over the television.  This is a serious deprivation.

16  This is something that has brought home to him the harshness

17  and the reality of what his current situation is.  You don't

18  need to ask him to spend another -- tell him he has to spend

19  another day in prison to teach him that he's not going to come

20  anywhere near anyone who is doing anything illegal for the rest

21  of his life.

22    And, Your Honor, a final word with respect to sentencing

23  disparities.  The highest sentence in the case so far is 20

24  years.

25        THE COURT:  Hold on.  Arthia Lamont Tanner, 240

1   months.

2           MS. GAMBINO:  That's correct.  And that's the highest

3   sentence imposed --

4           THE COURT:  But that's the maximum that he could have

5   gotten on the count that he pled to.  That was a plea

6   agreement.

7           MS. GAMBINO:  That's a plea agreement, and that's the

8   highest sentence that has been imposed in this case.

9           THE COURT:  That's the highest that he could've

10  gotten by law.

11          MS. GAMBINO:  And what we're asking you to do is give

12  Mr. Tanner the lowest sentence that he can get by law, which is

13  ten years because that sentence is more than sufficient to

14  address all the purposes of sentencing, and because we know

15  that even the Government doesn't think that the life sentence

16  called for by the guidelines is a reasonable sentence because

17  they were in here asking for 25 years.  They weren't willing to

18  put that on record.  They had it in an off-the-record

19  conversation.  So even they don't think --

20          THE COURT:  Ms. Gambino, let's set the record

21  straight on that.  Mr. Nozick came in and said, "I want to

22  apprize the Court that the Government is going to be asking for

23  25 years," and indicated that that was from downstairs, what he

24  was told to do.

25          MS. GAMBINO:  Exactly, which means that they

1    recognize --

2              THE COURT:  Let me finish, Ms. Gambino.  I've been

3    letting you finish.

4        I asked both of you to tell me what sentences you thought

5    were fair and why.  Mr. Nozick then filed a memorandum to the

6    Court saying after reviewing all of the facts of the case, he

7    felt that life was fair.

8              MS. GAMBINO:  That was because he didn't want to have

9    to put that on the record, Your Honor.

10             THE COURT:  He did put it on the record.

11             MS. GAMBINO:  He did.  When you told him he had to

12   put something on the record, then he went back and all of a

13   sudden the 25 years goes away and we're back to life again.

14             THE COURT:  Ms. Gambino, on every case that I have I

15   ask the attorney what sentence they think is fair.  That's what

16   I'm doing with you right now, and they do it on the record.

17             MS. GAMBINO:  That's correct, Your Honor.  When

18   somebody is willing to come to you and say off the record, "We

19   think 25 years is fair," and then you say, "Put that on the

20   record," and they come back to you with life again, what does

21   that say?

22             THE COURT:  He didn't say that.  He said, "I am going

23   to be asking for that," and indicated they came from

24   downstairs.

25             MS. GAMBINO:  Right, because that is what they

1    thought was reasonable a few weeks ago.

2         THE COURT:  He didn't make those comments.  He just

3    said that that's what he was going to do.

4       Ms. Gambino, don't add to it.  That's not what he said.

5         MS. GAMBINO:  Your Honor, I'm not saying that's what

6    he said, but he wouldn't be in the position of saying, "I'm

7    going to recommend 25 years" if somebody didn't think that was

8    a reasonable sentence.  That's a reasonable inference, Your

9    Honor.

10         THE COURT:  Ms. Gambino, I have no idea why or what

11    makes the U.S. Attorney's office tick.  I've been trying to do

12    that for 20-some years now, and I haven't been able to figure

13    that out.  I do know that oftentimes the upper echelon of the

14    office downstairs changes opinions as to what they feel they're

15    going to be asking for.  Sometimes there may be pressure coming

16    from the Justice Department in Washington.  I don't know why or

17    what or who was involved, and I don't know that I can make

18    these jumps that you very easily make.

19         MS. GAMBINO:  Your Honor, whether we make jumps or we

20    don't make jumps, what we're here to talk about is this man's

21    life.

22         THE COURT:  And I'm listening to you.  I am listening

23    to you on that, Ms. Gambino, but what I'm saying is that when

24    you say, "He said that's what he felt was fair," he's going to

25    get up in a minute now.  I'll find out what he's going to say

1    what he thinks is fair and why.  But I don't think that it's

2    fair to say that's what he said.  That wasn't what he said.

3            MS. GAMBINO:  I think it's completely fair to say

4    that what he said was, "We're going to recommend 25 years,"

5    Your Honor.  And I'm saying that if that's what he's saying,

6    then it looks like that's what they think is reasonable.

7    That's my opinion, and that's what anybody can take from it.

8            THE COURT:  That's different.  You have every right

9    to say what you think is reasonable, and I'll listen to that.

10           MS. GAMBINO:  And even that, Your Honor, the 25 years

11   I don't think is reasonable.  In this particular case, 10 years

12   and not a day more is what is reasonable for Mr. Tanner.

13       The other thing that you need to think about, or that

14   Congress says you have to think about, is restitution.  What

15   better restitution for Mr. Tanner then to let him work in his

16   community and tell young people how to avoid mistakes that he

17   made that landed him in this particular situation.  You know,

18   you have heard from a great constellation of people, not just

19   his friends, not just his family, not just his coworkers, but

20   his pastor and individuals who were professionals, lawyers, and

21   others who had faith in him and supported him.

22           THE COURT:  As a boxer and as an individual.

23           MS. GAMBINO:  As an individual human being and as a

24   boxer.  And all of those people are in place, many of them

25   here, and they are ready to continue supporting him.

 1          THE COURT:  How many of these individuals were

 2  present when all of these things allegedly occurred?  How many

 3  of these individuals were here throughout the trial to hear all

 4  of the evidence?

 5          MS. GAMBINO:  Your Honor, I don't know the answer to

 6  that question, but the important thing is what do you do --

 7          THE COURT:  I'm sorry.  You said I don't know what?

 8          MS. GAMBINO:  I don't know the answer to that

 9  question.  I don't know how many people were here during the

10  trial.  I don't know how many people were present.

11          THE COURT:  I was going to say you were here, but I

12  forgot this is the case where you came in later.

13          MS. GAMBINO:  Right.  I wasn't the lawyer at the

14  trial.

15     Your Honor, this is Duke's Indiana state champion belt

16  that he won as a young man, and he was on his way to becoming a

17  world champion boxer, and he could still pick up that thread

18  and pick up that trail if Your Honor imposes a sentence that is

19  reasonable in this case, a sentence of ten years and no more.

20     Mr. Tanner has already been in custody for nearly five

21  years, and he has suffered mightily during those five years as

22  has his family and his child.  His parents, each of them has

23  suffered strokes because of Mr. Tanner's absence and his

24  inability to help support his family the way he was doing when

25  he was boxing.  One of his parents had to go to a nursing home,

1   and the other is taken care of by a family member, and it's not

2   the choice of the family.  It's not what his parents would

3   like.  They would prefer very much to be together, but because

4   of the current circumstances and the financial condition of his

5   family, they're not able to.

6       If you were to allow Mr. Tanner to be released after a

7   reasonable sentence, then he could be again involved in

8   bringing his family back together and supporting them the way

9   he did as a young man.

10      And you heard testimony from Mr. Lewis and various other

11  individuals about the importance of Mr. Tanner to his family,

12  and about the fact that he was moving his family forward, and

13  that he had a lot on his shoulders as a young man.  When you're

14  23 and 24 years old, the typical life experience of a 23 and

15  24-year old that I'm sure you're familiar with and that I'm

16  familiar with in my own family, is that the family is helping

17  support them.  It's not that they are helping support the

18  family, but Mr. Tanner went professional as a boxer early when

19  he was only 18 or 19 years old to help support his family.  He

20  had a lot on his shoulders for a young person, and he managed

21  it well.  He did his boxing.  He was going to school.  He was

22  getting a good education, and all of those things are not going

23  to be available to him while he's in custody.

24      Your Honor is supposed to think about the best way to get

25  a person the education and the medical treatment and things of

1  that nature they need, and the best way for that to happen for

2  Mr. Tanner is for him to be released sooner rather than later.

3  And clearly he doesn't now present any threat to the society,

4  to any individual, or any other person sufficient to justify

5  sending him to prison for the rest of his life.

6      For all of those reasons, and for all of the reasons that

7  you heard from every person who testified before you, we're

8  asking you to impose a sentence of ten years and no greater.

9          THE COURT:  Ms. Rogers, would you get the microphone

10  and give it to Mr. Tanner?  I'm sorry.  I don't mean that

11  microphone.  This microphone there.  I apologize.

12      Mr. Tanner, I am going to ask you to bring it up close to

13  you.  Okay?

14          THE DEFENDANT:  Yeah.

15          THE COURT:  Just a few minutes.  Let your attorney

16  get back to you.

17          MS. GAMBINO:  Your Honor, I would like to ask that

18  the Government be permitted to go before Mr. Tanner, let him

19  have the last word.

20          THE COURT:  No.  We're not changing the rules,

21  Ms. Gambino.

22      Mr. Tanner, do you wish to make a statement on your own

23  behalf or present any information in mitigation of punishment?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Slowly and speak up.  Okay?

1              THE DEFENDANT:  Yes.

2              THE COURT:  You may.

3              THE DEFENDANT:  First and foremost, I want to praise

4    God and thank him for letting all you people, family and

5    friends, be here today, and I want to say I'm sorry for putting

6    you all through this.  All you guys know me.  You know my

7    character.  I'm not this man that the Government is portraying

8    me to be.  I hate the fact that you all are here instead of

9    coming back here.

10       I'm hearing what Ms. Gambino said, what the judge said,

11   what was at trial.  To tell you honestly, most of these people

12   was here at trial.  I know you all saw the tape.  I did not

13   say those -- I never confessed anything to those agents about

14   admitting to anything.  I wanted to speak about what really

15   happened.  I'm sure all you guys want to know the truth, but I

16   got appeal issues or whatever, so I got to bite my tongue, as

17   I've been doing for five years.

18       I don't know what's going on.  I'm not a drug dealer.  I'm

19   a fighter, man, and I'm a family man.  I came up to change my

20   family, and I think I did that.  That's really all I could say

21   to you guys.  I didn't have nothing to write.  I was reading,

22   and Marcus said at the hour when we be lifted up, the holy

23   spirit going to talk to me and let it talk for me.  So I don't

24   have nothing to write down.  I just want you guys to continue

25   to believe in me as to who I am.

1    As my father comes in now, I speak to all of you guys, but

2    the rest I just want to let you all know that based upon this,

3    Your Honor, what I done went through these last five years and

4    seeing everything that I worked for break up -- my mom and dad

5    was married for 39 years, and there's no amount of time that

6    can change that they broke up, and I'm not there to fix it.

7    I don't know what happened at trial.  I put it all in my

8    first lawyer, and he didn't do nothing.

9    And, Ms. Gambino, you told me I should not say some

10   things, but Nozick did say that he felt that the sentencing was

11   unfair.  I took it upon and let them come down and offered to

12   talk to me, and he said you was going to give me life, that if

13   I knew something about a police officer or something, but I

14   wasn't going to lie to get the time.  I don't know nothing to

15   tell nobody, and I don't know.  That's not my character.  I

16   don't have nothing to say.  I just know I'm not this person,

17   Your Honor.  I'm just not that person that they saying.  And I

18   know with my last name, how I grew up or whatever, but I've

19   wanted to change everything for everybody, and I might've got

20   caught in the mix of it, but I'm not a drug dealer, man.  I'm

21   not.  And when the truth will be brought out about this whole

22   situation, everybody going to know that I am the man that all

23   you guys thought.  And that I just want my Daddy to know I told

24   you when Mr. Weissman wanted me to go to college, and I said

25   that I'm going to turn pro now and move my family out of where

1  I come from.  And I never meant for you to have to go through

2  what you're doing.  And my Momma ain't here right now, but I

3  tell her the same thing.

4      And my son, he told me he didn't want to learn how to ride

5  a bike because he wanted me to teach him and do it, and it's

6  just not fair, Your Honor.  And I'm asking you -- it's nothing

7  in jail.  I can go to jail and go back every day, but memories

8  is important for my family and be there for my family.  I don't

9  care about no jail.  I don't care about life.  My thing was to

10  change my family, man.  I'm not a product of my community.  I

11  refuse to be that, and I don't want to be labeled as that.  And

12  I'm just asking you all, like, please just -- you studied this

13  case, Your Honor, and I know you did, and, man, them guys, they

14  lying on me.  I'm not that.  They wanted me to be.  I'm not.

15  And I stand here today, and I'm just asking for you to have

16  mercy on me.  And I still ain't got to tell you all how I

17  really feel and what really happened, but I'm not no drug

18  dealer.  I just give it all to God right now.  You make your

19  decision, but I know what happened, and that's all I got to

20  say.

21          THE COURT:  Mr. Nozick, does the Government have any

22  comments or recommendations as to the sentence this Court

23  should impose?

24          MR. NOZICK:  Yes, Your Honor.  Thank you.

25      The Government outlined, Your Honor, in our sentencing

1   memorandum the Government's position, and as you know, the

2   Government's position is that the guidelines are reasonable and

3   are just in this case.  This isn't a decision that we come to

4   easily, and it's not a decision that we come to without a great

5   amount of discussion amongst ourselves.

6       In the end, Judge, what we believe carries the day, and

7   what we believe makes the sentencing guidelines just in this

8   case and reasonable in this case is the enormous, widespread,

9   ongoing nature of the conspiracy.  It went on for years and

10  years.  We're not talking about one isolated episode, and it

11  involved multiple players, well over ten players, and it tore

12  apart the community, Judge, to be candid.  There was an

13  enormous amount of harm that was brought not just to the city

14  of Gary, but as you know, and as we heard testimony, these

15  drugs were being distributed in other spots in the state, going

16  down to Indianapolis, and I can't voice strongly enough the

17  harmful detrimental effect that cocaine has, both crack and

18  powder, on our communities.

19      You've already held are found by a preponderance that the

20  defendant was a leader, organizer of The Renegades.  I point

21  out were a violent street gang who absolutely wreaked havoc in

22  Gary, Indiana, and other parts of Northwest Indiana.

23          MS. GAMBINO:  Your Honor, I object to that

24  characterization.  There was no evidence at trial of that.

25  There was no evidence at the sentencing of that, and there has

1   been no evidence that Mr. Tanner was ever involved in anything

2   at all violent.

3           THE COURT:  Objection is overruled.  I'll give it

4   whatever weight I deem necessary.

5           MR. NOZICK:  I would also like to focus on the

6   massive quantity of narcotics distributed by The Renegades and

7   specifically by this defendant.  Now, we can go back and forth

8   on the credibility of the cooperating defendants.  A jury of

9   Mr. Tanner's peers found them to be credible, Judge.

10          Now, the PSR puts roughly 7,800 kilos of powder cocaine on

11  the defendant.  You know, that is likely on the high side

12  because that's done simply doing math of how many kilos a week

13  and multiplying the years.  The fact to get to this level, all

14  we need is 150 or more kilos more of cocaine.  Mr. Tanner

15  probably gets to that point in three weeks of this conspiracy

16  or four weeks of this conspiracy.  I'm not here to relitigate

17  the quantities.  You've already made your rulings on that, but

18  suffice it to say that the quantities in this case are

19  startling, and that's just of powder cocaine.  Just going

20  through some of the things.  And Ms. Gambino, I believe,

21  misspoke when she said that the amounts that you found and the

22  statements you read came simply from proffers given by

23  cooperators that are trying to help themselves.  That's not

24  true, Judge.  Everything the Government put in their version of

25  the facts and their memo and response to the objection,

1   everything we put to probation came straight from trial

2   transcripts.  So she said these witnesses, you know, never

3   testified under oath to these amounts, and it's just from their

4   proffer, and it's not subject to cross-examination.  That's not

5   true, Judge.  Everything that we put in our sentencing memo and

6   everything that was in our Government version and our response

7   to the objections was from the trial transcript with citations

8   to the trial transcripts.  So Mr. Tanner's lawyer had ample

9   opportunity to cross-examine these defendants on this testimony

10  and on the amounts, and obviously a jury found these witnesses

11  to be credible.

12       In addition, Judge, while Defense counsel disparages up

13  and down the quality and the truthfulness of the Government

14  witnesses, the flip defendants, the fact remains that the

15  defendant confessed in this case.  Now, he can sit here and say

16  that he didn't confess.  Yet FBI Agent Chris Allen, a decorated

17  FBI agent, testified to the defendant's own statement, and in

18  the defendant's own statement he puts massive amounts of

19  cocaine upon himself.

20       So Ms. Gambino can sit here, or stand here and say, Oh,

21  this is just a bunch of liars and flips trying to help

22  themselves, yet in doing so she's basically telling you FBI

23  Agent Chris Allen is a liar and perjured himself under oath in

24  order to convict this defendant.

25       Ms. Gambino discussed the fact that the Government, at

1    some point in chambers, had said that they were going to

2    recommend a 25-year sentence, and that is correct, Judge.  The

3    Government had -- I've been instructed by the U.S. Attorney to

4    request that sentence.  After some discussions with him, what

5    this honorable Court did was ask for briefings on it.

6    Ms. Gambino is incorrect in saying that I wouldn't put that on

7    the record and was scared to put that on the record.  That's

8    absolutely not true.  We have asked for below guideline

9    sentences, and Mr. Capp absolutely would not be -- have any

10   concern about putting that in a filing and putting it on the

11   record.  What did happen wasn't us being scared of putting on

12   the record what I represented in court.  What happened was that

13   the Court asked for it to be briefed.  And in doing so, we had

14   further discussions, lengthy discussions with other members of

15   the office, other members of brass, people from different

16   offices, you know, within this jurisdiction and went through

17   every single element in the case and every single item in the

18   PSR, and after doing so came to the conclusion that the

19   guidelines were reasonable.  If after that conclusion we had

20   come -- if after the discussions we had said, "Let's still ask

21   for 25 years."  We would have put that in writing.  I would not

22   have batted an eyelash about putting in, requesting 25 years in

23   writing, and neither would Mr. Capp.  There's nothing out there

24   in the press, out there in the community that we're afraid of,

25   and if a 25-year sentence was what we had concluded after those

1  further lengthy discussions, then that's what we would've

2  requested.

3      Mr. Tanner testified that there's a discussion that he and

4  I had, and I asked him for -- you know, to cooperate.  That's

5  absolutely correct.  I never would tell him exactly who he

6  would have to give us information on.  It's the Government's

7  belief, and it was the Government's belief that there was

8  information that he had that could have assisted us.  We

9  certainly have not rounded up every drug dealer in Gary.

10  Certainly it is our position that there may be police officers

11  that he had information on.

12          THE COURT:  "He" being Mr. Tanner?

13          MR. NOZICK:  "He" being Mr. Tanner.  And we didn't

14  say anything specific, but certainly I could represent that we

15  did not bring to justice and arrest everyone involved in this

16  large conspiracy.

17      So, yes, Judge, the Government did give him a chance to

18  cooperate, and obviously he has no obligation to.  Everyone has

19  their own code of ethics, code of conduct.  He chose not to,

20  and that is his right.

21      Defense counsel mentions a number of times the suffering

22  that his family has gone through, and I'm sure that's the case.

23  And I sincerely regret that they have gone through that,

24  although I would ask the Court to consider and Defense consider

25  that he, himself, put his family through that suffering, not

1   FBI, not Grit, not Special Agent Chris Allen, and not myself.

2   He's the person who made these decisions and put his family

3   through that suffering.

4        Finally, Judge, we've heard a ton of testimony about the

5   defendant's great boxing prowess and boxing ability.  The

6   Government does not dispute any of that, and it comes down, I

7   think, to, Judge, sort of perhaps a philosophical difference

8   and a jurisprudence difference on what weight, if any, this

9   honorable Court should give that fact.  You've been on the

10  bench a long time, Your Honor; Ms. Gambino has practiced longer

11  than I, and I think we all realize that we hear arguments day

12  after day in these courts, here, federal court in Chicago,

13  state courts where lawyers say, "This kid never had a chance.

14  This kid never had a chance.  He was doomed from the start.  He

15  had no possible legitimate source of income.  He had no other

16  way to feed his family."  Basically saying his excuse is that

17  he really had no choices and opportunities other than criminal

18  conduct.  He had no way of making it other than selling drugs.

19       Of course, Judge, this Court I'm sure rejects those

20  arguments, and, you know, there's never an excuse for this

21  criminal conduct.  But a guy like Duke Tanner really had no

22  excuse because he had this fantastic God-given talent,

23  apparently from what we all hear, and he had all sorts of ways

24  to provide for his family and to be a productive member of the

25  community.

1      So whereas with Ms. Gambino thinks him being a great boxer

2   is an argument for him, I don't think that helps him at all,

3   Judge.  And I've discussed this at great length with other

4   members of my office.  If anything that weighs against him.

5   Nobody has an excuse to sell drugs, but Mr. Tanner really had

6   no excuse because he did have all these other opportunities,

7   and he did have a way to provide for his family.  So,

8   respectfully, I don't see any of the testimony about his boxing

9   ability as weighing in his favor.

10      Based upon the arguments made, everything that we put in

11   our filings and arguments made today, Judge, I would argue, and

12   I do argue, that the life sentence found, or required under the

13   sentencing guidelines, is a fair and just sentence.  Thank you.

14         THE COURT:  Counsel, I'm going to recess right now

15   for lunch so I can look at the notes of what you said,

16   Ms. Gambino, and what Mr. Nozick said and what Mr. Tanner said.

17   I'll also look at a couple more things in the file.  I would

18   like for all of you to be back -- I want to give an hour, hour

19   and a half.  So if we start from right now, it takes us up to

20   1:45; is that correct?

21         MR. NOZICK:  Maybe 1:15.

22         THE COURT:  1:15.

23         MS. GAMBINO:  1:15 is an hour and a half.

24         THE COURT:  Okay.  I will say I want you back at

25   1:30.  Okay?

1              MR. NOZICK:  Yes, Your Honor.

2              THE COURT:  And I will finish the sentencing at that

3    time.

4          Marshals, you may take custody of the defendant.

5          (Break.)

6              THE COURT:  Mr. Nozick, are there any crime victims

7    related to the crimes charged who are to be notified of their

8    rights pursuant to the Justice of Law Act of the year 2004, as

9    codified in Title 18, United States Code, Section 3771?

10             MR. NOZICK:  No, Your Honor.

11             THE COURT:  Mr. Tanner, the job I have right now is

12   not something that I enjoy.  Of all the things I have to do in

13   my job, this by far is the worst.  I don't enjoy telling grown

14   men that what they've done is bad.  I don't enjoy taking grown

15   men or women, it's not always the man, from their families.  I

16   don't enjoy putting grown men in institutions, but it's

17   something that I swore to do, and I've been at this for

18   approximately 22 years, Mr. Tanner.  It doesn't get easy.  It

19   doesn't get easier at all.  But I swore to do my job and to try

20   to do it as well as possible.  To some degree, I have to take a

21   look at all of the facts, not only here, not only with the

22   people that come here during the trial and that are presented,

23   I have to look at the arguments of counsel so eloquently had

24   given me in this case.

25         No question a lot of people like you, a lot of people feel

1    very close to you.  That's good.  But I will say, Mr. Tanner,

2    that that disappointments me.  It upsets me because you have

3    betrayed in large part their trust in you.  I listened to the

4    evidence, as I said, earlier in this case, and I think the jury

5    got it right.  I think the evidence in this case was

6    overwhelming.  Did the Government go and find some people with

7    questionable past to testify?  Probably.  Did they go to the

8    sewer to get some of these people?  I don't know if I want to

9    go that far in this case, but they do in many cases, but,

10   Mr. Tanner, they do that because people who deal in drugs are

11   not in the church choir, are not up for sainthood, are not

12   leaders of the country.  You find them for that -- and I'm sure

13   you've heard of flop houses.  That's the lower end of the

14   thing.  But, again, you don't find these people in the better

15   places in a city.

16       In deciding a sentence for an individual, I have to

17   consider numerous things, Mr. Tanner.  What would be a fair

18   sentence.  That isn't easy.  A lot of people think that's

19   something that you just go out there and make a decision on or

20   take a dart and flip it at the board or do whatever you're

21   going to do.  I have to look at Congress's law and why they

22   pass it the way they did and how serious they consider it.  I

23   have to take a look at giving you a sentence that hopefully

24   will be a deterrent, not only to you but to society that this

25   is not acceptable and will not be tolerated, and if you lose,

1    you lose big time.  I have to take a look at my duty towards

2    society.  I've gone through the comments that you made earlier,

3    and I was impressed with several things.  During this trial,

4    Mr. Tanner, the one thing that kept coming back in my mind was

5    quantity of drugs that were involved here and the period over

6    which this conspiracy was lasting; even on a conservative

7    basis, it was about five years, but the quantity was

8    astronomical.  Why did I look at that?  Not because you have a

9    big, fancy cross, and I know the testimony was that somebody

10   loaned it to you; not because you drive a fancy car or have a

11   good life.  I looked at a lot of that, Mr. Tanner, because

12   that's the harm that's being done to our society.  This garbage

13   is going out into the street, and oftentimes, albeit there was

14   no evidence directly in this case, it goes to our children.

15   Mr. Tanner, there's no reason for me to doubt that every one of

16   these individuals love you dearly and care for you, but who is

17   here today to answer for the people who got this garbage into

18   their veins?  Who ruined their lives?  Who won't be able to get

19   an education because they sold their souls and their life and

20   everything else for this garbage?  Who no longer have any pride

21   in their life?  Who is speaking up for them?

22        You say that you are not a drug dealer.  Mr. Tanner, I beg

23   to differ.  From the evidence that I heard during this trial,

24   it was very, very strong.  The things that you did and how you

25   handled it -- and I submit, Mr. Tanner, people don't give kilos

1  of cocaine to somebody else to distribute unless, one, there's

2  a high degree of trust, and; two, they're able to do it.

3  They're able to distribute it.  If somebody gave me three kilos

4  of cocaine, I would probably go put it in the corner in the

5  living room and wouldn't know what the hell to do it.  They

6  want somebody that knows how to distribute this garbage, and

7  that, to me, was one of the pieces of evidence that also kept

8  just flashing back and flashing back, when you reached in that

9  car and grabbed that cooler what you thought was cocaine and

10  dealt with it.

11      Do I think that this is a serious crime?  No question

12  about it.  In 22 years I've seen life after life after life

13  ruined because of this garbage.  I've seen some people that

14  come to me because of the fact that they've been indicted, and

15  the reason that they're indicted is because they need it to put

16  in their veins because they're addicted to this thing, and I

17  spend thousands and thousands of dollars to send them up to

18  special programs, and you know what I'm told, Mr. Tanner?  Most

19  of them don't work.  Very, very sad.  But I try anything.  I

20  only say this, Mr. Tanner, because of the fact that I want to

21  impress upon everybody that this is a very serious crime.  I

22  sympathize with you, Mr. Tanner.  There's no question in my

23  mind you don't like that orange jumpsuit, and you never have

24  liked that orange jumpsuit, and I know you never will like it

25  either.  And I know you don't like being over at Porter County.

1    You're at Porter County, in large part, because of continuances
2    requested by your legal counsel, and you wanted to be close to
3    legal counsel, and I understand that because they were
4    assisting you.  This case should have been sentenced long ago,
5    and you should have gone to an institution and gone on with
6    your appeal on this case, which you have a right to do.  Again,
7    one of the things that was commented on was that you were a
8    first offender, and I really struggle with that.  I don't buy
9    it.  And, again, I go to the quantity of drugs that are
10   involved in this case.  Maybe you never got caught before.
11   Maybe nobody ever, you know, put you in jail for this before,
12   but there's no doubt that the testimony, which I found very
13   credible during this trial, that you have done this numerous
14   times.  I've heard stories about your boxing career, and I
15   sincerely hope that you could come back and continue on with
16   your boxing career and could be a role model.  That's a long
17   way, though, because of the things that have occurred.  It
18   doesn't make you a bad person, Mr. Tanner.  You're a human
19   being, and I would use language that men would use between each
20   other, and I won't do it here because I can't.  You messed up.
21   Human beings mess up.  Do I think that even if you got out
22   today you could go back to boxing?  Maybe.  I have my doubts,
23   not because you're not a good boxer, Mr. Tanner.  I wouldn't
24   want to get in the ring with you because I have no doubt in my
25   mind that you're a lot better than I would ever be, but you're

1    getting older and Father Time has a way -- I could be the first

2    to talk about that -- to take away many of our strengths.

3        Do I think that if I gave you the minimum in this case

4    that that would send a loud message to serve as a deterrent?

5    No, because even with large sentences, people continue to do

6    it.  Hopefully that has some of a message that is there.  Plus

7    you have another monkey on your back besides these drugs that I

8    don't even know if you were hooked on drugs or not.  I

9    shouldn't say you have a monkey on your back because you may

10   not be hooked on the drugs, and I am going to ask you,

11   Mr. Tanner, if you have a drug problem for your benefit

12   possibly.  You have gotten used to getting large sums of money.

13   I say that only because of the lifestyle that you talked about,

14   that cross full of diamonds that you were wearing, which I

15   still have doubts if that was a loan, and by the quantity of

16   drugs that were being involved.  Once you taste that money, it

17   had a big influence for you to go back and do it again.  I

18   certainly hope not, but I doubt that.  I think that is an

19   influence unfortunately.  Do I have any scientific proof on

20   that?  No, I don't.  It is what it is, and, you know, take it

21   for whatever it's worth.

22       You came and you talked about your spiritual support and

23   how involved you were in the churches, and that's a plus.

24   That's good.  I'm happy about that.  I'm happy -- in fact, I

25   said I don't necessarily consider you, as an individual, mean.

1  You know, I don't see you going around and knocking kids off

2  the sidewalk and pushing them into the garbage can or

3  something, but I still look back at the facts in this case, and

4  it appears that you were doing all of this while you were

5  working at the church.  Is that a Dr. Jeckyl and Mr. Hyde?

6  That's very possible.  So where I give you a plus, there's also

7  a minus there.  And I don't see where your church involvement

8  failed or prevented you from participating in the crimes at

9  issue.

10       Mr. Tanner, the evidence today, or the comments today talk

11  about your being a loving father.  The jury is out on that

12  somewhat.  I only say that because of the fact that you were

13  doing these things while you had a child, and you know that

14  this could have happened to your child.  You still have time to

15  make amends and to get closer to that child.  The sentence in

16  this case by the guidelines, which I only consider as a factor,

17  is high, but I also take a look at the quantity of drugs that

18  you have responsibility for, and that is very, very high.  I

19  take a look at what your role was in this offense.  You were a

20  leader, and I look as to whether or not you were one of the

21  worst offenders in the laws of the United States, and I believe

22  that you were.  Do I want to protect society?  Do I want to

23  protect those kids?  I can't go to every school and try to

24  protect them, but maybe some of these sentences will send that

25  message out, "Not on my watch."  I want to protect society, and

1    it needs protection because we only have to take a look at what

2    a high number of the people get addicted to these drugs.

3         Your attorney talked about education.  I'm not sure,

4    Mr. Tanner, what educational prospects are offered by an

5    institution.  I know there are some, and I know that if you

6    apply, if you have the qualifications, you can get a degree.

7    In some cases I've seen where they've gotten a degree or two

8    degrees.  I look at this case, Mr. Tanner, and I look at the

9    number of years that this conspiracy existed.  I looked at the

10   quantity of drugs that were passed.  I take a look at your role

11   in this offense.  I've taken a look at the 3553(a) issues as

12   well as what would be a deterrent, a fair sentence, an adequate

13   period time for rehabilitation, and I have decided upon the

14   following sentence, which I will read at this time.

15        Pursuant to Title 18, United States Code, Section 3551 and

16   3553, as modified by *U.S. vs. Booker and Fanfan*, it is the

17   judgment of the Court that the defendant, Charles Tanner, is

18   hereby committed to the custody of the Bureau of Prisons for a

19   term of life on each of the two counts, 2 and 3, to be served

20   concurrently.  Upon release from imprisonment, the defendant

21   shall be placed on supervised release for a term of 10 years.

22   This term consists of 10 years on each of Counts 2 and 3.  All

23   such terms to run concurrently.  Within 72 hours of release

24   from the custody of the Bureau of Prisons, the defendant shall

25   report in person to the probation office in the district to

1    which this defendant is released.  While on supervised release,

2    the defendant shall not commit another federal, state, or local

3    crime; shall comply with the 15 standard conditions that have

4    been adopted by this Court, and shall comply with the following

5    additional conditions:  The defendant shall submit to one drug

6    test within 15 days after being placed on supervised release

7    and up to two periodic tests thereafter.  The defendant shall

8    not illegally possess any kind of controlled substance.  The

9    defendant shall not possess any kind of firearm or other

10   destructive device.  The defendant shall cooperate in the

11   collection of DNA as directed by the probation officer.  In

12   addition, the defendant shall comply with the following special

13   conditions:  The defendant shall participate in a drug and

14   alcohol aftercare treatment program under a copayment plan

15   which may include testing for the detection of drugs and abuse

16   at the direction and discretion of the probation officer.  The

17   defendant shall participate in a copayment program to offset

18   the cost of treatment.  The copayment amount is based on the

19   annual poverty guidelines established by the U. S. Department

20   of Health and Human Services on a sliding scale basis.  The

21   copayment amount shall not exceed an amount determined by the

22   probation department and probation officer's sliding scale for

23   monthly copayment.  While under supervision, the defendant

24   shall not consume alcoholic beverages or any mood-altering

25   substances which overrides the no excessive use of alcohol

1   language in standard condition number seven.  It is further

2   ordered that the defendant shall pay to the United States a

3   special assessment of $200, which is due immediately.  It is

4   further ordered that the defendant shall pay to the United

5   States District Court Clerk's Office at 5400 Federal Plaza,

6   Hammond, Indiana, a fine of $1,000.  The fine shall be paid in

7   full immediately.  The defendant shall make fine payments from

8   any wages earned in the prison, and, of course, with the Bureau

9   of Prisons Financial Responsibility Program.  Any portion of

10  the fine that is not paid in full at the time of the

11  defendant's release from imprisonment shall become a condition

12  of supervision.

13       Counsel, was there a forfeiture count, or was there an

14  agreement regarding forfeiture?

15           MS. JACOBS:  Yes, Your Honor.  There was forfeiture,

16  and you've already issued final orders on those.

17           THE COURT:  That's taken care of already?

18           MS. JACOBS:  That's all taken care of.

19           THE COURT:  The guideline range in this case exceeds

20  24 months, and the reason for imposing the sentence set out the

21  sentence are as follows:  The guideline range for this case is

22  life imprisonment.  The Court is imposing a sentence of life

23  because of the nature of the crime, the height of quantity of

24  drugs involved, the damage to society, the adequate punishment,

25  an adequate deterrent, lack of remorse, and the defendant's

1   leadership in this case and for the other reasons already

2   enunciated.

3       At this time, I'll ask both counsel if you know of any

4   reason other than reasons already argued -- strike that.

5       Ms. Gambino, I know there's a life sentence in this case.

6   I don't know whether the defendant has a drug problem.  In the

7   event that there should be a reduction of sentence, if he

8   qualifies, are you asking that he be put in a drug

9   rehabilitation program, and does he have a drug problem?  Does

10  he qualify?

11          MS. GAMBINO:  We would ask for the recommendation and

12  also for the recommendation that he be sentenced to a facility

13  in Indiana, but before that I would ask that you reconsider

14  this unjust, unreasonable, and excessive sentence.

15          THE COURT:  The only institution that I know of in

16  Indiana, a federal institution, is Terre Haute probably.

17          MS. GAMBINO:  That's correct.

18          THE COURT:  Any objection from the Government?

19          MR. NOZICK:  No objection.

20          THE COURT:  Court, one, recommends that in the event

21  he qualifies, that he be allowed to participate in a drug

22  rehabilitation program.  If he does have a monkey on his back,

23  I want it off.  It will make life much more better to live.

24          MS. GAMBINO:  It would give him a chance to have a

25  life, Your Honor, if you would reconsider this excessive

1  sentence.

2         THE COURT:  Ms. Gambino, I don't want to speak to

3  you.  You made your point already.  That motion is denied.

4     Okay.  This Court also orders that the defendant receive

5  credit for time already served.

6     Anything else that I missed?

7         MS. GAMBINO:  I will ask you one final time, Your

8  Honor, to reconsider an unjust, unreasonable, and excessive

9  sentence.

10        THE COURT:  Mr. Tanner, you have heard the judgment

11 of the Court adjudging you guilty and imposing sentence upon

12 you.  Pursuant to Rule 32(a)(2) of the Federal Rules of

13 Criminal Procedure, I now advise you that you may have a right

14 to appeal your conviction of sentence in this case, and if you

15 wish to file an appeal and are not able to pay the cost of such

16 an appeal, you may apply for leave to appeal in forma pauperis,

17 which means that you may be able to pursue an appeal at no cost

18 to you.

19    Ms. Gambino, you are retained?

20        MS. GAMBINO:  Yes, and we will file a notice of

21 appeal this afternoon.

22        THE COURT:  Ms. Gambino, just answer the questions

23 that I'm asking you.  You can file whatever motions you want,

24 but I've got to get the answers to the questions I have.  Are

25 you retained?

1              MS. GAMBINO:  Yes, I am retained.

2              THE COURT:  Your retained counsel, of course, is

3    authorized to initiate the appeal process, if you so desire.

4        Ms. Gambino, I remind you of your duty to perfect a timely

5    appeal of this sentence should your client wish to do so.

6    Furthermore, pursuant to Circuit Rule 51, you are responsible

7    for the continued representation of your client on appeal

8    unless specifically relieved by the Court of Appeals upon a

9    motion to withdraw.

10       Finally, all requests for appointment of appellate counsel

11   must be taken to the Court of Appeals.  This Court does not

12   have the power to entertain such requests.

13       With that, Counsel, is there anything further that need to

14   be done on this case at this time?

15             MS. GAMBINO:  Not at this time.

16             MR. NOZICK:  No, Your Honor.

17             THE COURT:  Marshals are ordered to take custody of

18   the defendant for sentence.

19       (Hearing concluded.)

20

21

22

23

24

25                   CERTIFICATE OF REPORTER

1        I, Richard D. Ehrlich, a Registered Merit Reporter and

2    Certified Realtime Reporter, certify that the foregoing is a

3    true, complete, and accurate transcript of the proceedings

4    ordered to be transcribed in the above-entitled case before the

5    Honorable Rudy Lozano, in Hammond, Indiana, on May 26, 2009.

6    s/Richard D. Ehrlich                    August 14, 2009

7    Richard D. Ehrlich, Official Reporter                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25